Receipt number AUSFCC-8598888

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. ___ 23-416 C

**COMPLAINT OF LENNAR CORPORATION AND HPS DEVELOPMENT CO., LP AGAINST DEFENDANT UNITED STATES OF AMERICA:**

**(1) INDEMNIFICATION UNDER SECTION 330**

LENNAR CORPORATION AND HPS DEVELOPMENT CO., LP,

        Plaintiffs,

    v.

UNITED STATES OF AMERICA,

        Defendant.

**TABLE OF CONTENTS**

I.   INTRODUCTION ....................................................................................................1

II.  PARTIES ................................................................................................................4

III. JURISDICTION AND VENUE ...........................................................................4

IV.  FACTS ....................................................................................................................5

      A.   The Hunters Point Naval Shipyard ................................................................5

      B.   San Francisco and Lennar's Redevelopment of the Shipyard ................................6

      C.   Tetra Tech Work at the Shipyard ...................................................................7

      D.   The *Carter* Lawsuit and Plaintiffs' Section 330 Request for Indemnification ........8

      E.   DoD's Denial of Plaintiffs' Request for Indemnification ....................................10

V.   Cause of Action ....................................................................................................11

(Claim for indemnification under section 330) ...........................................................11

VI.  PRAYER FOR RELIEF ......................................................................................14

# I.  **INTRODUCTION**

1.      This is a civil action against the United States of America, acting through its agency the Department of Defense ("DoD"), for failing to meet the indemnification mandate set forth by Section 330 of the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, Div. A, Title III, § 330, 106 Stat. 2371 (Oct. 23, 1992), *amended by* Pub. L. No. 103-160, Div. A, Title X, § I 002, l07 Stat. 1745 (Nov. 30, 1993) ("Section 330").

2.      Congress enacted Section 330 to protect developers who undertake the difficult but critically important process of converting to civilian use former military bases which the United States has determined are no longer needed for military purposes and has cleaned up. This process is governed by the Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, §§ 2901-2911, 104 Stat. 1485, 1808-19 (codified as amended at 10 U.S.C. § 2687 note (2000)) ("BRAC").

3.      Section 330 ensures that developers to whom former military property is transferred under the BRAC process can rely on the assurances they receive from DoD about the environmental health of the property.  The mechanism through which it provides that assurance is by guaranteeing that, should anything go wrong with the United States' remediation of the property or allegations arise that environmental contamination was left behind after the DoD's cleanup process is declared complete, developers will be fully indemnified from the costs incurred defending any legal action that may occur as a result.

4.      Section 330's protections are expansive.  Senator John McCain from Arizona, who sponsored the indemnity legislation, made clear its intended purpose in the course of the legislative process.  Speaking in opposition to language in an earlier version of the bill which would have insulated the Government from indemnification for environmental claims, Senator McCain summarized the statute's central purpose: "We simply cannot ask States or businesses to assume potentially devastating liability for conditions they did not create. Moreover, the Federal Government has a duty to accept full and unconditional responsibility for its actions. Last year, I introduced legislation to ensure that the Federal Government remains fully responsible for

hazardous waste problems at military installations after base closure. The bill requires the Department of Defense to defend, hold harmless, and indemnify innocent receivers of the property against claims arising from pollution caused by military activities. This protection is absolutely critical if we are to promote the timely and efficient transmission of base property to new and productive uses." 138 Cong. Rec. S13982–01 (daily ed. Sept. 18, 1992), 1992 WL 229896. Congress passed the version of the bill with the provisions that Senator McCain advocated for: a strict mandate imposing duties on the United States for cases exactly like this.

5.      Plaintiffs Lennar Corporation and HPS Development Co., LP (collectively, "Plaintiffs") were entitled to rely and did rely on Section 330 when they assumed the lead role in redeveloping the former Hunters Point Naval Shipyard ("HPS" or the "Shipyard"), a formal naval base located in the San Francisco Bay area. HPS had been the site of nuclear research facilities and was contaminated with radiation and other hazardous substances when it was decommissioned. The Environmental Protection Agency ("EPA") eventually designated HPS as a Superfund site and placed it on the National Priorities List under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), section 105, 42 U.S.C. § 9605, prioritizing it for investigation and cleanup.

6.      The Navy was charged with removing the contamination from HPS so that it could eventually be transferred to the City of San Francisco for residential and commercial redevelopment. Over more than a decade, the Navy contracted with a private environmental remediation firm, Tetra Tech EC, Inc. ("Tetra Tech"), to perform that work. The Navy and Tetra Tech assured Plaintiffs that their work was being performed appropriately and in full compliance with all applicable laws and regulations. Therefore, following the Navy's declaration that certain parcels of HPS were safe for transfer and for residential development, Plaintiffs commenced building at those parcels.

7.      Although Plaintiffs did not know it at the time or for many years later, Tetra Tech falsified significant proportions of its remediation work. Years later, when Tetra Tech's

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

misconduct came to light, Plaintiffs were sued (as defendants) in several lawsuits arising from the Navy and Tetra Tech's mismanagement of the cleanup at HPS.

8.    This action concerns Plaintiffs' request for defense and indemnification related to *Carter v. Tetra Tech*, No. CGC-18-567302 (San Francisco Cty. Super. Ct., filed June 15, 2018), which was one of the first HPS actions to be filed against Plaintiffs. Plaintiffs were dismissed from the case in March 2019.

9.    Consistent with Section 330, in July 2018, Plaintiffs informed DoD of the *Carter* lawsuit promptly after it was filed and, pursuant to the statute, requested that DoD defend and indemnify Plaintiffs in full for the costs resulting from the *Carter* litigation. Pursuant to Section 330, DoD at that point was entitled to assume Plaintiffs' defense in the *Carter* case. Aside from an August 7, 2018 letter acknowledging Plaintiffs' request for defense and indemnification, however, DoD refused to take a position on whether or not it would provide the defense Plaintiffs had requested.

10.    In April 2019, Plaintiffs informed DoD that they (Plaintiffs) had been dismissed from the *Carter* Action. Plaintiffs requested indemnification for the legal costs incurred in defending the *Carter* action and submitted detailed invoices and timesheets for the work performed by Plaintiffs' counsel. Plaintiffs timely and comprehensively responded to all follow-up requests from DoD. Yet for years, DoD refused to state whether or not it would comply with its legal obligations and indemnify Plaintiffs for the costs they had been subjected to as a result of the failed cleanup of HPS.

11.    Finally, in September 2022—more than two years after Plaintiffs had submitted the detailed billing information DoD had requested—DoD made a final decision denying Plaintiffs' right to indemnification for the *Carter* case. DoD "assume[d], without deciding, that the Lennar entities are parties entitled to indemnification under Section 330," but then concluded that certain of Plaintiffs' billing entries were not sufficiently clear to show that they were tied to the *Carter* litigation. DoD also determined that Plaintiffs' defense costs were not "facially

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

reasonable."  Citing both reasons, DoD denied Plaintiffs' request for indemnification in its entirety.

12.    Plaintiffs requested reconsideration of that decision and offered a detailed declaration explaining the methodology for apportioning certain defense tasks between the *Carter* case and other related litigation, consistent with Section 330's implementing regulations for seeking reconsideration.  DoD failed to respond within 30 days as required by law.  *See* 32 C.F.R. 175.6(i).  Plaintiffs have been forced to file this action to vindicate their rights and hold the United States accountable for its broken promises.

## II.    PARTIES

13.    Defendant United States of America is named based upon the activities and liability of DoD.  The United States is responsible for the transfer of HPS pursuant to BRAC, and is obligated to provide indemnification under Section 330.

14.    Plaintiff Lennar Corporation is a Delaware corporation with its headquarters and principal place of business located in Miami, Florida.

15.    Plaintiff HPS Development Co., LP is a limited partnership and subsidiary of Lennar doing business in the State of California, including in or around San Francisco.

16.    Both Plaintiffs own or owned certain real property in HPS and have been harmed by DoD's refusal to indemnify them for legal costs incurred as a result of lawsuits in which they have been named as defendants and that arise from threatened exposure to hazardous substances left behind at HPS as a result of the Navy's activities.

## III.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to the Tucker Act because the claims asserted herein are for money damages arising under an "Act of Congress."  28 U.S.C. § 1491(a)(1).

18.    Plaintiffs exhausted their administrative remedies against the United States.  On July 6, 2018, Plaintiffs submitted a completed written request for defense and indemnification pursuant to Section 330 to the United States in connection with lawsuits filed against Plaintiffs,

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

including the *Carter* action.  On September 27, 2022, the United States sent Plaintiffs a letter denying the *Carter* request.

19.      On October 26, 2022, Plaintiffs filed a request for reconsideration of the *Carter* denial.  The United States' response to that request was due no later than November 25, 2022.  The United States never responded.  Plaintiffs therefore bring this action within six months of the date from the which the United States' response to the request for reconsideration was due, pursuant to 32 C.F.R. 175.6(i).

<h3 align="center">IV.   <u>FACTS</u></h3>

**A.**      **<u>The Hunters Point Naval Shipyard</u>**

20.      HPS is located on a promontory in southeastern San Francisco (as shown in the image below), and consists of approximately 936 acres, about half of which is submerged beneath the San Francisco Bay.



21.      The Navy purchased the property in 1939, augmenting it to create a full-service ship repair and maintenance facility with numerous support buildings.  The Navy used the site for ship repair during World War II and the Korean War, and also for radiological research, among other things.  The Navy's operation of the Shipyard from the 1930s to the 1960s contaminated HPS with radionuclides.

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

22.     The Navy deactivated HPS in 1974 and leased most of the site to a commercial ship repair company from 1976 to 1986.  In 1991, the Shipyard was selected for closure pursuant to the BRAC process.

23.     In 1992, the Navy delineated the Shipyard into separate parcels, including Parcels A, B, C, D, and E.

**B.      San Francisco and Lennar's Redevelopment of the Shipyard**

24.     On January 21, 1994, the Navy, the City and County of San Francisco, and the City and County of San Francisco Redevelopment Agency ("SFRA") executed a memorandum of understanding to establish the process for conveying HPS to the City and County of San Francisco for reuse.  Pursuant to a Conveyance Agreement between the Navy and City and County of San Francisco, the Shipyard is to be transferred in phases.  Each portion of the Shipyard is scheduled to be transferred after the Navy completes environmental remediation on that portion and is able to issue a Finding of Suitability to Transfer ("FOST") for that specific portion of the Shipyard.

25.     On July 14, 1997, the City and County of San Francisco approved a Redevelopment Plan for the Shipyard by Ordinance No. 285-97.

26.     On April 22, 1998, the SFRA issued a Request for Qualifications for the conveyance, management, and redevelopment of the Shipyard.  On March 30, 1999, the SFRA determined that Lennar/BVHP LLC (a subsidiary of Lennar) was the most qualified of the developer teams that had submitted responses, and selected Lennar/BVHP LLC as the master developer for the entire Shipyard.

27.     On June 1, 1999, the SFRA and Lennar/BVHP LLC entered into an Exclusive Negotiations Agreement setting forth the terms and conditions under which the parties would negotiate the conveyance, management, and redevelopment of the Shipyard.

28.     On July 22, 2003, the SFRA approved the Conceptual Framework for Phase 1 of the development of the Shipyard.  Phase 1 called for Lennar/BVHP LLC to build approximately 1,600 residential units, at least 32% of which would be affordable to low- and moderate-income

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

residents, and a mix of approximately 30% rental units and 70% for-sale units, commercial space, community development facilities, and active and passive open space.

29.     Lennar/BVHP LLC and the SFRA entered into a Disposition and Development Agreement on December 2, 2003, formally recognizing that Lennar/BVHP LLC and the SFRA were "committed to developing the entire Shipyard."

30.     In 2004, the Navy issued a FOST for Parcel A and thereafter conveyed portions of the Shipyard to the SFRA pursuant to a written conveyance agreement.  In 2005, the Agency then conveyed a majority of Parcel A of the Shipyard to Lennar/BVHP, LLC.  Lennar BVHP, LLC assigned its interest in Parcel A to HPS Development Co., LP.

**C.**     **Tetra Tech Work at the Shipyard**

31.     From 2003 to 2014, the United States Navy contracted with Tetra Tech to perform services related to radiological sampling and remediation of radioactive materials at HPS. Before each parcel of HPS could be released for redevelopment, Tetra Tech was required to test soils and surfaces to ensure any radioactivity was below regulatory limits.

32.     Plaintiffs broke ground on the first new homes on Parcel A in 2013, expended hundreds of millions of dollars in infrastructure and development costs, and built in excess of 300 homes by May 2018.

33.     On May 2, 2018, the District Court for the Northern District of California unsealed criminal plea agreements from two former Tetra Tech employees in *United States v. Stephen C. Rolfe*, Case No. 17-cr-0123 (N.D. Cal.) and *United States v. Justin E. Hubbard*, Case No. 17-cr-0278 (N.D. Cal.).  Those plea agreements disclosed publicly for the first time that Tetra Tech supervisors had engaged in a pattern of fraudulent practices rising to the level of criminal culpability, including, among other things, falsification of soil sampling data.  As a result, Tetra Tech's environmental remediation data has been called into question.

34.     Shortly after the criminal plea agreements were unsealed, numerous individuals who live or work at or near HPS filed lawsuits.  Tetra Tech is and remains a primary focus of the

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

various complaints, but several suits also named Plaintiffs as defendants.  This complaint and request for indemnification concerns one of those lawsuits: the *Carter* lawsuit.

**D.**     **The *Carter* Lawsuit and Plaintiffs' Section 330 Request for Indemnification**

35.     On June 15, 2018, Richard Thomas Carter, Jr. and Juarinton De Stephano Carter filed a lawsuit naming Tetra Tech and Plaintiffs (among others) as defendants.

36.     The complaint alleged that historical Navy operations at HPS resulted in radiological and other hazardous substance and pollutant contamination of soil, dust, sediments, surface water, and groundwater at HPS.  The complaint alleged that the Navy contracted with Tetra Tech to clean up and remove contamination (including radioactive contamination) from HPS, but that Tetra Tech employees falsified and mishandled soil samples, radiological scans, building surveys, and records, and did not properly remediate HPS.  As a result of Tetra Tech's failure to properly remediate HPS, the plaintiffs alleged they were exposed to radioactive and highly toxic materials and substances from historic Navy operations.

37.     The plaintiffs alleged they were "contractors and workers that were physically present at [HPS]" from May 2015 to June 2017, that plaintiff Richard Thomas Carter Jr. had been diagnosed with incurable cancer caused by exposure to contaminants at HPS, and that plaintiff Juarinton De Stephano Carter was in fear of contracting cancer and other illnesses caused by exposure to contaminants at HPS.

38.     The complaint also alleged personal injury causes of action against Plaintiffs predicated upon the contamination of HPS, including claims for negligence, intentional and/or negligent infliction of emotional distress, public nuisance, private nuisance, injunctive and/or declaratory relief, premises liability, and liability pursuant to Cal. Civil Code § 1714.

39.     On July 6, 2018, Plaintiffs tendered notice to DoD of the lawsuits to which it had been named as of that time, including the *Carter* lawsuit, and concurrently submitted a request for defense and indemnification under Section 330.

40.     On August 7, 2018, DoD acknowledged receipt of Plaintiffs' request for indemnification under Section 330.  DoD noted that its "office will adjudicate any request for

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

indemnification or defense by [] Lennar Corporation."  The letter also noted that "section 330 also provides for a right of the United States to defend against any claim that might be subject to indemnification under section 330," and stated that DoD would "apprise [Plaintiffs] of any determination" regarding their request for defense under Section 330.  The letter ultimately concluded, however, that DoD's response did "not constitute a final action" and that DoD would "review [Plaintiffs'] letter and its attachments and advise [Plaintiffs] if additional information [was] required."

41.     Over the next several months, without further determination from DoD regarding the status of Plaintiffs' request for defense and indemnification under Section 330, Plaintiffs' counsel worked diligently to evaluate the issues relevant to the case and negotiate a dismissal of the *Carter* action.  The *Carter* plaintiffs entered into a stipulation dismissing all claims against Plaintiffs on February 26, 2019.  On March 18, 2019, Plaintiffs formally filed the notice of dismissal in San Francisco Superior Court.  This was an excellent outcome but one that required Plaintiffs to incur legal defense fees and costs.

42.     Shortly thereafter, in April 2019, counsel for Plaintiffs informed counsel for DoD of the dismissal via email.  At that time, counsel for DoD asked whether Plaintiffs intended to submit their defense costs in connection with the *Carter* litigation for indemnification under Section 330.  Plaintiffs' counsel informed DoD that they would do so.

43.     On August 14, 2019, Plaintiffs submitted their defense costs for the *Carter* action, totaling $171,855 in attorneys' fees.

44.     That same day, DoD finally responded to Plaintiffs' earlier requests for defense and indemnification under Section 330, stating for the first time that "DoD cannot provide the requested defense" and reserving a final decision on the requests for indemnification "until the claims giving rise to the requests accrue."

45.     Throughout the remainder of 2019, Plaintiffs communicated regularly with DoD. On August 29, 2019, and September 23, 2019, Plaintiffs asked DoD to clarify whether it had

denied indemnification.  DoD responded on September 27, 2019 that it had not yet made a final decision.

46.     On December 11, 2019, DoD sent a letter to Plaintiffs requesting more information on its claims and the *Carter* dismissal.  The letter requested "all information related to [Plaintiffs'] claim for defense costs/indemnification," including providing DoD with "access to [Plaintiffs'] time and billing sheets, vendor invoices, costs, and expenses."  DoD stated that the letter did not constitute a final adjudication and that upon receipt of the requested information, it would "determine what further facility access or additional documents of [Plaintiffs] may be necessary to adjudicate the claim."

47.     On July 17, 2020, Plaintiffs submitted to DoD the requested information and their detailed timesheets from the *Carter* action for reimbursement.  Plaintiffs provided detailed responses to each of DoD's questions from its December 11, 2019 letter, attaching ten exhibits of documentary proof.  Plaintiffs also submitted a revised total of $119,095.92 for their litigation costs, excluding some costs that Plaintiffs previously submitted for reimbursement because they were primarily related to other lawsuits, which have separate Section 330 requests for indemnification still pending.

48.     Following the submission of those detailed time entries, Plaintiffs repeatedly requested information from DoD regarding its position on Plaintiffs' request for those defense costs, including but not limited to formal written letters on December 29, 2020, May 18, 2021, and September 29, 2021.

**E.     DoD's Denial of Plaintiffs' Request for Indemnification**

49.     On September 23, 2022, more than two years after receiving Plaintiffs' billing records and without requesting further information in connection with the *Carter* case or otherwise indicating any issues with the documentation it had received, DoD denied Plaintiffs' request for indemnification for defense costs in the *Carter* action.

50.     In its denial letter, DoD did not find that Plaintiffs' requests were not qualified for indemnification under the express terms of Section 330.  In fact, DoD acknowledged, "For

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

purposes of this adjudication, we assume, without deciding, that the Lennar entities are parties entitled to indemnification under Section 330." Nevertheless, DoD took the position that Plaintiffs' billing entries lacked sufficient detail to indicate whether certain tasks were related to the *Carter* defense and that Plaintiffs had failed to adequately segregate defense costs for other litigation related to HPS. DoD also asserted that, even if the billing entries were all properly allocated to the *Carter* defense, the amount Plaintiffs requested was not "facially reasonable."

51.     On October 26, 2022, Plaintiffs sent DoD a request for reconsideration responding to the alleged deficiencies in Plaintiffs' billing entries.

52.     Under 32 C.F.R. 175.6(i), DoD's response to Plaintiffs' request for reconsideration was due within 30 days, or no later than November 25, 2022. DoD failed to respond by the deadline and, to date, has not provided any response.

## V.     CAUSE OF ACTION

## (CLAIM FOR INDEMNIFICATION UNDER SECTION 330)

53.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 52 above as if fully set forth herein.

54.     Section 330(a)(1) provides, in pertinent part, that:

> [T]he Secretary of Defense shall hold harmless, defend and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or a loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened of any hazardous substance or pollutant or contaminant as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.

55.     Plaintiffs are persons or entities as described in Section 330(a)(2)(C) and (D) in that Plaintiffs acquired ownership of the properties at HPS before selling the properties as transferees to the homeowners.

56.     Plaintiffs incurred the costs and fees they seek to recover in this action as a result of a claim, demand, or action by site workers who were exposed to radioactive and carcinogenic materials while working on the Shipyard properties.  The United States identified HPS as a Superfund site and contracted with Tetra Tech to remove radioactive and carcinogenic material from the properties, with the United States Navy as the lead agency for the investigation and cleanup.  As a result of Tetra Tech's fraudulent cleanup and resulting alleged threats to health caused by the exposure to hazardous substances, Plaintiffs were named as defendants in the *Carter* action.  Thus, the expenses Plaintiffs incurred are the type of costs and fees covered by Section 330.

57.     The radioactive and carcinogenic toxic materials on the properties are the result of the United States' historical activities at HPS, including using the site as a Naval nuclear testing site.

58.     HPS meets the definition of a "military installation" as defined by § 330(f)(2).

59.     Section 330(b) requires that an entity seeking costs and fees under Section 330 notify DoD in writing within two years after such claim accrues, furnish copies of any pertinent papers received and evidence or proof of any claim, and provide the DoD access to its records and personnel for purposes of defending or settling the claim or action.

60.     As set forth above, Plaintiffs notified the United States promptly after the *Carter* action was commenced and demanded that it indemnify, hold harmless, and defend Plaintiffs against the lawsuit and any other demands arising out of the radioactive and carcinogenic materials at HPS.

61.     Plaintiffs also provided the United States with relevant documents related to its claims and, over more than a four-year period, fully and timely informed the United States of the

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

basis for Plaintiffs' claims for defense and indemnity in extensive correspondence concerning the *Carter* claim and its dismissal.

62.     Plaintiffs have met all conditions precedent to recovery under § 330.

63.     Defendants failed and refused to take any action to defend Plaintiffs against the lawsuits against them, including the *Carter* action, thereby forcing Plaintiffs to assume their own defense costs.  Even though DoD knew of the *Carter* action as early as July 2018, and was entitled at that point to assume Plaintiffs' defense in the litigation, it made no decision on the issue until August 2019, several months ***after*** Plaintiffs' outside counsel had secured dismissal of all claims against Plaintiffs in that litigation without incurring discovery or related litigation costs.

64.     Defendant is responsible pursuant to § 330 for indemnifying Plaintiffs for all costs and fees incurred as a result of lawsuits arising out of the release of radioactive and other hazardous substances at HPS.

65.     Plaintiffs incurred costs of $119,095.92 in attorneys' fees litigating the *Carter* action, a direct result of Defendant's release of hazardous substances and other contaminants at HPS.

66.     Defendant's denial of Plaintiffs' request for indemnification did not find that Plaintiffs' request failed to satisfy any requirement under Section 330 or its governing regulations.  Instead, DoD denied Plaintiffs' request because, according to DoD, a handful of entries among the hundreds of pages of detailed billing statements Plaintiffs submitted lacked the specificity DoD would have liked to see.  DoD also summarily concluded that Plaintiffs' defense costs were not "facially reasonable."  On the basis of both determinations, DoD declared that ***none*** of Plaintiffs' defense costs should be reimbursed.

67.     To compound matters, DoD made no effort to provide Plaintiffs even a minimal opportunity to discuss its concerns with the allegedly insufficient billing entries or the overall reasonableness of its costs.  Instead, DoD chose to deny Plaintiffs the defense they had

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

requested, sit on billing entries for Plaintiffs' defense costs for more than two years, and then deny Plaintiffs *any* recovery.

68.     DoD's denial of the entirety of Plaintiffs' claim for indemnification for its defense costs has no basis in Section 330's text and is facially unreasonable.

## VI.     PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray for relief as follows:**

69.     Judgment in favor of Plaintiffs and against Defendant United States with respect to Plaintiffs' claims;

70.     $119,095.92 plus any additional amounts proven at trial as provided in Section 330;

71.     For interest thereon at the maximum legal rate; and

72.     Such other relief as the Court may deem just and proper.

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA

Dated:  March 24, 2023                    RESPECTFULLY SUBMITTED,


By:      /s/ Geoffrey H. Yost
         Geoffrey H. Yost, *Counsel of Record*
         O'MELVENY & MYERS LLP
         2 Embarcadero Center, 28th Floor
         San Francisco, CA 94111-3823
         Telephone: +1 415 984 8700
         Facsimile: +1 415 984 8701
         Email: gyost@omm.com

         Daniel M. Petrocelli, *Of Counsel*
         David Marroso, *Of Counsel*
         Madhu Pocha, *Of Counsel*
         O'MELVENY & MYERS LLP
         1999 Avenue of the Stars, 8th Floor
         Los Angeles, California 90067-6035
         Telephone: +1 310 553 6700
         Facsimile: +1 310 246 6779
         Email: dpetrocelli@omm.com
                 dmarroso@omm.com
                 mpocha@omm.com

         Attorneys for Plaintiffs LENNAR
         CORPORATION AND HPS
         DEVELOPMENT CO., LP

LENNAR'S COMPLAINT AGAINST
UNITED STATES OF AMERICA